# EXHIBIT E

UNITED STATES DISTRICT COURT
· EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FIDUCIARY ASSET MANAGEMENT, LLC, )
)
            Plaintiff, )
)      Civil Action No. 4:07-cv-301-HEA
vs. )
)
JEFFREY O. SWOPE, )
)
            Defendant. )

### MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
### FOR RECOVERY OF COSTS OF SERVICE OF PROCESS

       The plaintiff, Fiduciary Asset Management, L.L.C. (the "Company" or "Plaintiff"), by its

attorneys, provides its Memorandum in Support of its Motion for Recovery of Costs of Service

of Process from the defendant, Jeffrey O. Swope ("Defendant" or "Swope").

**I.**     **Introduction.**

       On February 12, 2007, Plaintiff filed this declaratory judgment action following a

demand made in writing by Swope on January 2, 2007, for payment of $14,000,000 following

the termination of his employment by the Company. Schroeder Aff. at ¶ 3.[1]  The Company

responded to Swope's demands in writing denying those demands. Schroeder Aff. at ¶ 4. The

Company then filed this declaratory judgment action to resolve the claims asserted by Swope and

mailed Swope a waiver of service form along with all required process. Schroeder Aff. at ¶ 5.

The Company also provided a courtesy copy of the waiver form to Swope's attorney. Schroeder

Aff. at ¶ 6. After Swope failed to return the waiver form, the Company's counsel discussed the

waiver with Swope's attorney. Schroeder Aff. at ¶ 7. Swope's attorney indicated that he would

---

[1] A copy of the affidavit of Stanley G. Schroeder has been filed simultaneously with this memorandum.

not accept service on behalf of Swope. Schroeder Aff. at ¶ 8. Swope gained actual knowledge of the lawsuit through this process.

Plaintiff then attempted to serve Swope with formal process at his New York, New York residence only to have the doorman of Swope's building inform him Swope was not present. *See, infra,* section III(A). Plaintiff then attempted service in Austin, Texas having learned Swope would be in Austin visiting relatives. *See, infra,* section III(B). The process server in Austin, Texas was able to confirm that Swope was staying at that location but had the door shut in his face when the residents concluded he was attempting to serve Swope with process. *See, infra,* section III(B). Finally, Plaintiff had its New York, New York process server attempt service again. *See, infra,* section III(C). The process server was again told Swope was not present by the doorman. *See, infra,* section III(C). Eventually, the process server was able to post the summons and complaint on Swope's door in accordance with New York Rules of Civil Procedure ("N.Y. Rule") § 308(4). *See, infra,* section III(C).

The Company now respectfully requests that this Court enter an order requiring Swope to pay Plaintiff for its costs in serving Swope.

**II.    Defendant Refused to Waive Service Pursuant to a Proper Request Under Federal Rule of Civil Procedure 4(d).**

On February 12, 2007, the Company mailed to Swope, via both certified mail, return receipt requested and regular U.S. Mail: (1) two copies of the Notice of Lawsuit and Request for Waiver of Service of Summons which included an actual (1) Waiver of Service of Summons; (2) one copy of the Disclosure of Corporate Interests; (3) one copy of the Complaint; and (4) one pre-paid envelope for his return of the executed waiver of service. Attached as *Exhibit 1* is a copy of the letter that was mailed to Swope via Certified Mail, Return Receipt Requested, with its attachments. Because the Company had information that Swope may have been residing at

either of two New York addresses, the Company mailed its February 12, 2007 letter to both addresses: (a) 210 East 68th Street, Apt. 8AB, New York, New York 10021; and (b) 150 East 52nd Street, 10th Floor, New York, New York 10021. The mailing addressed to the 52nd Street address was returned as undeliverable. The mailing to East 68th Street was received and was signed for as demonstrated by the return receipt attached hereto as *Exhibit 2*. The waiver of service complied with Federal Rule of Civil Procedure 4(d) and was provided on a form contained on the website of this Court.[2] As of March 14, 2007, thirty days had passed without Swope's executing and returning the Company's waiver of service form. In fact, Swope has to this day not waived personal service. Schroeder Aff. at ¶ 8.

III.    **Plaintiff Incurred Significant Costs in Serving Swope, Who Knew of the Action and Attempted to Dodge Service.**

Undoubtedly, Swope had timely actual notice of the lawsuit as a result of the mailing that was accepted at his 68th Street residence in New York. Counsel for Plaintiff, moreover, contacted the attorney that wrote Swope's demand letter and informed him of Plaintiff's filing of this declaratory judgment action. Rather than waiving service, Swope ignored the waiver of service form. Swope did his best to attempt to evade and avoid actual service.

A.    **Plaintiff's First Attempts at Service at Defendant's New York, New York, Residence.**

On March 20, 2007 this Court issued an alias summons to Plaintiff for service upon Swope at his 68th Street address. On April 4, 2007, Robert Akin ("Akin"), process server, attempted service of process upon Swope. Akin Aff. ¶ 5.[3] The doorman of Swope's building confirmed Swope's residing at that location, called Swope's residence, and reported there was no answer. Akin Aff. ¶ 5. Akin indicated he would return the next day. Akin Aff. ¶ 5. On April 5,

---

[2] http://www.moed.uscourts.gov/Forms/Civil/fillWaiverServiceSummons.pdf.
[3] The affidavit of Robert Akin is attached to this memorandum as *Exhibit 3*.

2007, Akin again attempted service, only to be told by the doorman that Swope was out of town traveling with his family. Akin Aff. ¶ 6.

**B.    Plaintiff's Attempts to Serve Defendant in Austin, Texas.**

On April 6, 2007, Plaintiff requested a summons be issued so that Swope could be served at a family member's house in Austin, Texas at which Swope was staying for the Easter weekend. Plaintiff had James Griffith ("Griffith"), process server, attempt service in Austin, Texas at 4011 Westlake Drive. During the morning of April 7, 2007, Griffith attempted service on Swope, but there was no answer at the door. Griffith Aff. ¶ 5.[4] During the afternoon of April 7, 2007, Griffith attempted service again, but there was no answer at the door, despite two cars being parked in the driveway. Griffith Aff. ¶ 6.

During the evening of April 7, 2007, Mr. Griffith attempted service and a man answered the door. Griffith Aff. ¶ 7. Mr. Griffith asked for Swope and was told that Swope was not home at the moment, but that Swope would be back later. Griffith Aff. ¶ 7. The unidentified man then asked whether there was anything he could do for Griffith, who responded no thank you, that the matter was for Swope, and that he needed to discuss it with Swope personally. Griffith Aff. ¶ 7. Griffith then asked the man what time Swope would be home. Griffith Aff. ¶ 7. The man asked what the matter was about and Mr. Griffith explained that he could not give out that information. Griffith Aff. ¶ 7. The man then yelled "you are a goddamned process server!" at which point he told Mr. Griffith that Swope would not be returning and slammed the door in Mr. Griffith's face. Griffith Aff. ¶ 7.

Griffith dutifully returned the following day, April 8, 2007 at approximately 2:00 p.m. Griffith Aff. ¶ 8. Griffith knocked on the door, but no one answered. Griffith Aff. ¶ 8. Griffith heard people's voices behind the door, heard locks engage on the door, and heard one person tell

a dog to be quiet. Griffith Aff. ¶ 8. Griffith also noticed four cars parked in the driveway.

Griffith Aff. ¶ 8. Griffith then waited eight hours, until 10:00 p.m., to see if anyone would leave

the house, but no one did. Griffith Aff. ¶ 8. The next day, April 9, 2007, Griffith again traveled

to the residence on West Lake Street and knocked on the door. Griffith Aff. ¶ 9. There was no

answer, so he posted a copy of the summons and complaint to the door. Griffith Aff. ¶ 9.

> **C.**   **Service of Process Upon Swope via New York Rules of Civil Procedure  §
> 308(4).**

On April 19, 2007, Plaintiff obtained another summons to serve Swope at his 68th Street

address in New York, New York. On April 30, 2007, Akin attempted to serve Swope at the 68th

Street address. Akin Aff. at ¶ 8. The doorman called the apartment, but received no answer to

his call. Akin Aff. at ¶ 8. On May 3, 2007, Akin again attempted to serve Swope. Akin Aff. at

¶ 9. The doorman called Swope's apartment, but received no answer. Akin Aff. at ¶ 9. On May

12, 2007, Akin entered the building and rode the elevator to the eighth floor. Akin Aff. at ¶ 10.

Akin posted the summons and complaint to Swope's door and mailed it to Swope pursuant to

N.Y. Rule § 308(4) and Rule 4(e). Akin Aff. ¶ 10. Akin then mailed a copy of the summons and

complaint to Swope's address on May 14, 2007, via certified mail return receipt requested. Akin

Aff. at ¶ 11. On May 21, 2007, Akin received the return receipt indicating the package had been

received and signed for. Akin Aff. at ¶ 12.

**IV.    Defendant is Entitled To Costs Incurred In Pursuing Service Of Swope Pursuant to
Rule 4(d) And In Pursuing This Motion.**

Rule 4(d) is intended "to shift the unnecessary costs of formal service from the plaintiff

to the defendant." *See, Stapo Inds., Inc. v. M/V Henry Hudson Bride*, 190 F.R.D 124, 126

(S.D.N.Y. 1999). As the Advisory Committee Notes to the 1993 revision of Rule 4 dictate, the

waiver of service process and the attendant shifting of costs for refusing to waive service, are

---

[4] The affidavit of James Griffith is attached to this memorandum as *Exhibit 4*.

intended "to eliminate the costs of service of a summons on many parties and to foster

cooperation amongst adversaries and counsel." By shifting costs of service to a defendant who

refuses to waive service, the rule is intended to help in dealing with "furtive" defendants. Rule 4

advisory committee's notes of 1993 amendment. The legislative history of Rule 4 reveals that its

purpose is "to encourage the prompt return of the form so that the action can move forward

without unnecessary delay," and "[f]airness requires that a person who causes another additional

and unnecessary expense in effecting service ought to reimburse the party who was forced to

bear the additional expense." *Premier Bank, Nat'l Assoc. v. Ward*, 129 F.R.D. 500, 502 (M.D.

La. 1990) (citation omitted).

In this case, Defendant's action reveal him to be just the sort of furtive defendant to

whom the assessment of costs was addressed to. Defendant clearly had actual notice of the

lawsuit, refused to waive service, refused to allow his attorney to either waive service or to

accept service of process, evaded service in Austin, Texas and New York, New York, filed a

separate action in New York, and thus unnecessarily increased the costs of service, leading to

just the sort of result Rule 4 is meant to stop. It is only just, therefore, that Defendant bear the

costs of his own evasive conduct.

Rule 4(d) provides that "[a]n individual . . . that is subject to service under subdivision (e)

. . . and that receives notice of an action in the manner provided by in this paragraph has a duty to

avoid unnecessary costs of serving the summons." Rule 4(d)(2). The rule further provides that if

a defendant fails to comply with a request for waiver of service, "the court shall impose the costs

subsequently incurred in effecting service on the defendant unless good cause for the failure be

shown." Rule 4(d)(2). Rule 4 also provides for the award of the costs incurred to effect service

and "the costs, including a reasonable attorney's fee, of any motion required to collect the costs

of service." Case law has affirmed that costs of service, such as process server fees, attorneys'

fees in effecting service, and attorneys' fees in pursuing a motion to recover costs of service are

proper upon a defendant's refusal to waive service. *See, Stapo Inds., Inc.*, 190 F.R.D. at 126 ("it

would be anomalous to interpret [Rule 4(d)] not to encompass the attorney's fees incurred by

formal service.").

Defendant has incurred a total of $4,058.41 in legal fees to effect service to: (a) obtain

summons; (b) coordinate service with two process servers; and (c) file an executed summons.

Schroeder Aff. at ¶ 10.  In addition, Plaintiff has paid the New York process server retained to

serve Swope $550 and has paid the Texas process server $485.  Schroeder Aff. at ¶ 9.

Plaintiff has attempted to collect these fees via a certified mailing to Swope's 68th Street

address.  Schroeder Aff. at ¶ 13.  Swope, by his attorney, indicated Swope will not pay Plaintiff's

costs.  Schroeder Aff. at ¶ 13.  This motion , therefore, was necessary to collect Plaintiff's costs.

The affidavit of Schroeder was filed simultaneously with this memorandum and certifies

the amounts claimed above and certifies the attorneys' fees incurred in bringing this motion.

Plaintiff spent $840 in drafting and filing this motion.  Schroeder Aff. at ¶ 11.  Plaintiff's total

costs in effecting service upon Swope and in pursuing this motion are $5,933.41.  Schroeder Aff.

at ¶ 12.

## V.    Conclusion.

Plaintiff is entitled to its costs for service of process on Swope, because Swope had actual

knowledge of the lawsuit, Swope refused to waive personal service, Swope then attempted to

evade and avoid service thereby increasing the costs of service, and Swope refused to pay

Plaintiff's costs incurred in pursuing service after a demand for same.  The total costs and fees in

effecting service and pursuing this motion are $5,933.41.

Respectfully submitted,

/s/ Stanley G. Schroeder
Stanley G. Schroeder, ARN 24953
Robert W. Stewart, ARN 4463
The Lowenbaum Partnership, L.L.C.
222 South Central Avenue, Suite 901
Clayton, MO 63105
(314) 746-4835 – Direct
(314) 746-4825 – Direct
(314) 863-0092 - Main
(314) 746-4848 - Fax
sschroeder@lowenbaumlaw.com
rstewart@lowenbaumlaw.com

Dated: July 27, 2007.                     **Attorneys for Plaintiff**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via U.S. mail this 27th day of July 2007 upon the following:

Mr. William L. Sessions
Sessions Lambert Selwyn, L.L.P.
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201

(counsel for Defendant)

/s/ Stanley G. Schroeder

THE LOWENBAUM PARTNERSHIP, L.L.C.

Matthew B. Robinson
314.746.4802
mrobinson@lowenbaumlaw.com

February 12, 2007

CERTIFIED MAIL #7001 0360 0003 9252 4716
RETURN RECEIPT REQUESTED

Mr. Jeffrey O. Swope
210 East 68th Street, Apt. 8AB
New York, NY 10021

CERTIFIED MAIL #7001 0360 0003 9252 4723
RETURN RECEIPT REQUESTED

Mr. Jeffrey O. Swope
150 East 52nd Street, 10th Floor
New York, NY 10021

Re:    *Fiduciary Asset Management, LLC vs. Jeffrey O. Swope*, Civil Action No. 07-301,
       United States District Court, Eastern District of Missouri, Eastern Division

Dear Mr. Swope:

I have enclosed the following in connection with the above-referenced matter:

1.    Two copies of the Notice of Lawsuit and Request for Waiver of Service of
      Summons which include a Waiver of Service of Summons;

2.    One copy of the Disclosure of Corporate Interests; and

3.    One copy of the Complaint.

Please execute one copy of the Waiver of Service of Summons and return it to me. I
have also enclosed a self-addressed and postage prepaid envelope for that purpose. If you have
any questions regarding these matters, please do not hesitate to contact me.

Sincerely,

THE LOWENBAUM PARTNERSHIP, L.L.C.

By _____

Matthew B. Robinson

MBR/nrs
Enclosures
cc:    Addressee by first class mail to both addresses

EXHIBIT
1

222 South Central Avenue, Suite 901, St. Louis, MO 63105
Phone 314.863.0092  Fax 314.746.4848
www.lowenbaumlaw.com



# United States District Court
## EASTERN DISTRICT OF MISSOURI
### NOTICE OF LAWSUIT AND
### REQUEST FOR WAIVER OF SERVICE OF SUMMONS

---

**\* \* Plaintiff to Complete Gray Area \* \***

---

TO:   Jeffrey O. Swope, 210 East 68th Street, Apt. 8AB, New York, NY 10021
    (Name of defendant)
    (as _____ of _____ )
        (Title)                (Name of business)

A lawsuit has been commenced against you (or the entity on whose behalf you are addressed). A copy of the complaint is attached to this notice. It has been filed in the United States District Court for the Eastern District

of Missouri and has been assigned docket number 07-301 .

This is not a formal summons or notification from the court, but rather my request that you sign and return the enclosed waiver of service in order to save the cost of serving you with a judicial summons and an additional copy of the complaint. The cost of service will be avoided if I receive a signed copy of the waiver within  30  days after the date designated below as the date on which this Notice and Request is sent. I enclose a stamped and addressed envelope (or other means of cost-free return) for your use.  An extra copy of the waiver is also attached for your records.

**If you comply with this request and return the signed waiver to the undersigned, it will be filed with the court and no summons will be served on you.** The action will then proceed as if you had been served on the date the waiver is filed, except you will not be obligated to answer the complaint before 60 days from the date designated below as the date on which this notice is sent (or before 90 days from that date if your address is not in any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will take appropriate steps to effect formal service in a manner authorized by the Federal Rules of Civil Procedure and will then, to the extent authorized by those Rules, ask the court to require you (or the party on whose behalf you are addressed) to pay the full costs of such service. In that connection, please read the statement concerning the duty of parties to waive the service of the summons, which is set forth on the foot of the waiver form.

I affirm that this request is being sent to you on behalf of the plaintiff, this 12th day of February , 20 07 .

_____
Signature of Plaintiff's Attorney or
Unrepresented Plaintiff

---

**DUTY TO AVOID UNNECESSARY COSTS OF SERVICE OF SUMMONS**

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer, than if the summons had actually served, when the request for waiver of service was received.

-Page 1-



# United States District Court
## EASTERN DISTRICT OF MISSOURI

## WAIVER OF SERVICE OF SUMMONS

**NOTICE TO DEFENDANT(S)**

**\* \* Plaintiff To Complete Gray Area \* \***

To:  Stanley G. Schroeder, The Lowenbaum Partnership, 222 S Central, Ste 901, Clayton MO 63105
(Name of plaintiff's attorney or unrepresented plaintiff)

I acknowledge receipt of your request that I waive service of a summons in the action of:

Case Caption:  Fiduciary Asset Management v. Swope

Case Number:  07-301

in the United States District Court for the Eastern District of Missouri. I have also received a copy of the complaint in this action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or motion under Rule 12 is not served upon you within 60 days after _____,
(Date Waiver sent)
or within 90 days after date if the request was sent outside the United States.

**DEFENDANT'S ACKNOWLEDGMENT OF WAIVER OF SERVICE**

_____
Date

_____
Print name

_____
Signature

as _____
(Officer or Agent)

of _____
(Corporation or Association)

_____
Address

_____
City, State, Zip Code

- Page 2-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIDUCIARY ASSET MANAGEMENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-301 |
| vs. | ) | |
| | ) | |
| JEFFREY O. SWOPE, | ) | |
| | ) | |
| Defendant. | ) | |

**DISCLOSURE OF CORPORATE INTERESTS**

Pursuant to Federal Rule of Civil Procedure 7.1 and Rule 2.09 of the Local Rules of the United States District Court for the Eastern District of Missouri notice is hereby given by counsel of record for Defendant that the following corporate interests are disclosed:

1. The parent companies of the corporation: None.

2. Subsidiaries not wholly owned by the corporation: None.

3. Any publicly held company that owns ten percent (10%) or more of the corporation: None.

1

Respectfully submitted,

THE LOWENBAUM PARTNERSHIP, LLC


/s/ Robert W. Stewart
Stanley G. Schroeder, ARN 24953
Robert W. Stewart, ARN 4463
222 South Central Avenue, Suite 901
Clayton, MO 63105
(314) 746-4835 – Direct
(314) 746-4825 – Direct
(314) 863-0092 - Main
(314) 746-4848 - Fax
sschroeder@lowenbaumlaw.com
rstewart@lowenbaumlaw.com

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FIDUCIARY ASSET MANAGEMENT, LLC,  )
                                  )
            Plaintiff,            )
                                  )    Civil Action No. _____
vs.                               )
                                  )
JEFFREY O. SWOPE,                 )
                                  )
            Defendant.            )

## COMPLAINT

Comes now Plaintiff, FIDUCIARY ASSET MANAGEMENT, LLC, by and through its

attorneys, and states to the Court as follows

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and

28 U.S.C. § 2201, because the citizenship of the parties is diverse and Plaintiff seeks declaratory

judgment.

2.    Plaintiff is a Missouri limited liability company and, on information and belief,

Defendant is a resident and citizen of the state of either Texas, Louisiana or New York.

Defendant is not a resident or citizen of the state of Missouri.

3.    The amount in controversy in this matter exceeds $75,000, because Defendant has

threatened suit against Plaintiff for Fourteen Million Dollars ($14,000,000,00) plus other relief

with respect to the facts alleged herein.

4.    Personal jurisdiction over Defendant is based upon the Missouri long-arm statute,

R.S. Mo. §§ 506.500.1(1) and (2) because: (a) Defendant has regularly transacted business in the

state of Missouri, (b) Defendant's threatened claims and Plaintiff's request for declaratory

judgment arise from that business, and (c) Defendant has claimed compensation and payments

and has threatened immediate litigation with respect to compensation and an ownership interest

in Plaintiff based upon contract(s) which Defendant contends were or must have been formed in Missouri.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because a substantial part of the claim described in this action occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

**PARTIES**

6.    Plaintiff, Fiduciary Asset Management, LLC, is, and was at all times noted in this Complaint, a Missouri limited liability company in good standing, engaged in commerce, and doing business in Missouri.

7.    Plaintiff's principal place of business is located in the Eastern District of Missouri at 8112 Maryland Avenue, Suite 400, St. Louis (Clayton), Missouri 63105.

8.    At all times relevant to this action, Plaintiff has been engaged in the business of providing investment management and advisory services to a variety of entities including tax exempt entities, such as retirement plans and trusts, and their corporate sponsors and high net worth individuals.

9.    As a Missouri limited liability company, Plaintiff's ownership structure and operations are governed by an operating agreement, i.e. the "Operating Agreement," which is required and created pursuant to Missouri limited liability company law.

10.    The Operating Agreement is expressly governed by Missouri law.

11.    This Operating Agreement describes the nature of membership and ownership interests which Members may have as well as Member entitlements to payments, distributions, liquidation proceeds and redemption or liquidation values.

12.    Plaintiff is a registered investment advisor under the Investment Company Act of 1940 and is licensed to provide investment management and investment advisory services in Missouri and several other states.

13.     Plaintiff is an investment sub-advisor for several mutual funds and maintains and operates limited partnerships which Plaintiff has developed and pursuant to which shares and interests are issued in compliance with the Investment Company Act of 1940, the Securities Act of 1933 and Missouri law.

14.     As part of its investment management and advisory services, Plaintiff has developed and maintains a variety of other investment management and advisory products, services and strategies designed to appeal to a variety of investor groups and investment and asset allocation strategies.

15.     Plaintiff obtains fee income from the users of its investment management and advisory services pursuant to a variety of investment management, investment advisory and investment administrative service arrangements.

16.     Plaintiff also generates fee income from revenues earned by providing investment advice to those mutual funds, limited partnerships, other investment vehicles and strategies which it advises or has developed and maintains and pursuant to which it has issued, and continues to issue, shares and interests.

## EMPLOYMENT OF DEFENDANT BY PLAINTIFF

17.     During 2002, Plaintiff decided to retain the services of an employee to lead in marketing its products and services and to obtain wider exposure for them within the financial community.

18.     Plaintiff retained the service of an executive recruiting firm to locate qualified candidates for a new marketing position

19.     The executive recruiting firm proposed Defendant as a candidate for the position.

20.     Defendant met with Plaintiff in its St. Louis facility to interview for the position.

21.    Defendant proposed an initial marketing approach to promote and gain wider exposure for Plaintiff's business within the financial community and to induce Plaintiff to hire him.

22.    On or about March 29, 2002 and in reliance upon Defendant's promises and assurances regarding implementation and development of a marketing strategy, Plaintiff made an offer of employment to Defendant.

23.    Plaintiff conveyed that offer of employment to Defendant through a letter (i.e., the "Offer Letter") dated March 29, 2002.

24.    The Offer Letter described terms of compensation which may be payable to Defendant during his employment, stated the date by which the offer must have been accepted and stated approximately when employment would commence.

25.    The Offer Letter did not provide for any payments of compensation to Defendant after his termination of employment with Plaintiff.

26.    At no time during the interview process or during Defendant's employment, did Plaintiff promise or even suggest that Defendant would be paid any of the compensation opportunities described in the Offer Letter after Defendant's termination of employment from Plaintiff.

27.    The Offer Letter did not describe: (a) the scope of Defendant's duties, (b) any performance objectives or goals, (c) that termination would only be for good cause, (d) Defendant's reporting relationship, (e) the location of Defendant's performance, or (f) the nature of any supervisory duties which Defendant may have.

28.    The Offer Letter did not describe Defendant's expected hours of work or place of work.

29.     The Offer Letter did not contain an offer of employment for any specific period, nor a statement that Defendant's employment would last for a specific period, nor a statement that it could end only as a result of termination for cause.

30.     At no time did Plaintiff make an offer of employment to Defendant for any definite term or period, nor did Plaintiff and Defendant ever agree that Defendant would be employed for a definite term or period.

31.     At no time did Plaintiff and Defendant form or enter into any written or oral employment contract which specified a definite term of employment or which specified terms and conditions of employment.

32.     At no time did Plaintiff and Defendant form or enter into any written or oral contract which provided for any payments of compensation or commissions to Defendant following his termination of employment with Plaintiff.

33.     Defendant commenced employment with Plaintiff on April 5, 2002.

**DEFENDANT'S EMPLOYMENT AND CONTACTS WITH THIS DISTRICT**

34.     While Defendant worked for Plaintiff, Defendant performed various marketing and business development services for Plaintiff as its Senior Vice President, Director of Marketing and Client Relations (from July, 2002 through November, 2004) and as Managing Director, Business Development and Investor Relations from November, 2004 until his termination of employment.

35.     Defendant understood and acknowledged that his primary duties were (a) to promote the Plaintiff's services, products and investment management and advisory performance among the investment community, (b) to educate other investment management and advisory consultants regarding the nature and quality of Plaintiff's services and performance, (c) to develop and implement a comprehensive marketing and business development plan including the aforementioned tasks, (d) to enhance Plaintiff's website to display information that would

enhance Plaintiff's reputation and assist with marketing its services and (e) to develop standard marketing and informational materials.

36.    While employed by Plaintiff, Defendant was provided an executive office by Plaintiff at its facility in St. Louis, Missouri and Defendant routinely used that office.

37.    Although Defendant traveled extensively outside of Missouri while employed by Plaintiff:

(a)    Defendant and his position were based in St. Louis, Missouri;

(b)    Defendant had been advised by Plaintiff that he was to spend time in its St. Louis office to be a marketing resource and to be available to consult with Plaintiff's senior management located in St. Louis regarding assessment and development of marketing strategy;

(c)    When Defendant became employed by Plaintiff, he was advised that he was to relocate to St. Louis;

(d)    During the first year of his employment with Plaintiff, Defendant was generally present in his St. Louis office every week and for much of each week.

(e)    Later during his employment with Plaintiff, Defendant's physical presence in Plaintiff's St. Louis office was somewhat reduced but he generally continued to appear in and work from that office periodically, i.e. sometimes on a weekly basis and sometimes on a monthly basis.

(f)    Defendant received instructions from and coordinated his services with individuals located in St. Louis, Missouri.

38.    While employed by Plaintiff, Defendant reported directly to and was supervised by the Plaintiff's Manager, Charles D. Walbrandt, who was located in Plaintiff's St. Louis, Missouri facility.

39.     While employed by Plaintiff, Defendant routinely met with Mr. Walbrandt at Plaintiff's St. Louis, Missouri facility to discuss various operational, performance and strategy issues.

40.     During periods when Defendant was in Plaintiff's St. Louis facility, he typically met with Mr. Walbrandt on a daily basis.

41.     While employed by Plaintiff, Defendant routinely met with other of Plaintiff's senior executives at Plaintiff's St. Louis, Missouri facility to discuss various operational, performance and strategy issues.

42.     During periods when Defendant was in Plaintiff's St. Louis facility, he met with other members of Plaintiff's senior management on a daily basis.

43.     While employed by Plaintiff, Defendant supervised, or assisted with the supervision of, approximately nine (9) of Plaintiff's employees at various times.

44.     Of these personnel supervised by Defendant, six (6) were located in Plaintiff's St. Louis, Missouri facility.

45.     While employed by Plaintiff, Defendant routinely met at Plaintiff's St. Louis, Missouri facility with the personnel whom he supervised and generally did so on multiple occasions during most months.

46.     For approximately one year while employed by Plaintiff, Defendant maintained a residence located in St. Louis County, Missouri.

47.     While employed by Plaintiff, Defendant maintained a bank account at The Business Bank of St. Louis, located at 8000 Maryland Avenue, Ste. 100, St. Louis (Clayton), Missouri.

48.     While employed by Plaintiff, Defendant was routinely paid by Plaintiff and his pay was calculated, approved and issued from its St. Louis, Missouri facility and/or from Plaintiff's agents located in St. Louis County, Missouri.

49.    Plaintiff's bi-weekly paychecks were direct deposited to his account maintained at The Business Bank of St. Louis.

50.    While traveling on behalf of Plaintiff, Defendant incurred various airfare, hotel, rental car, subsistence and other business expenses.

51.    To obtain reimbursement for business expenses incurred while traveling for Plaintiff, Defendant periodically submitted expense reports to Plaintiff at its St. Louis, Missouri facility for approval and payment.

52.    While Defendant was employed by Plaintiff, Defendant was provided with a variety of compensations including a base salary and various employee benefits including health insurance, long term disability insurance, group life insurance and participation in an employer-paid, tax qualified defined contribution profit sharing plan.

53.    Plaintiff's employee health benefit plan, in which Defendant participated and through which Defendant and his family was insured, was maintained in St. Louis, Missouri.

54.    Plaintiff's tax qualified, defined contribution retirement plan, in which Defendant participated, was maintained in St. Louis, Missouri.

## LIMITED LIABILITY COMPANY INTERESTS

55.    While Defendant was employed by Plaintiff, Defendant was also provided, as part of his package of compensation, membership in Plaintiff as a Class B member.

56.    As a condition to obtaining the Class B membership interest in Plaintiff, Defendant was required to execute various documents such as Bylaws and other corporate instruments.

57.    On or about May 31, 2002, Defendant executed these documents at Plaintiff's St. Louis (Clayton), Missouri facility.

## TERMINATION OF DEFENDANT'S EMPLOYMENT

58.    On July 3, 2006, Plaintiff terminated Defendant's employment.

59.    Plaintiff terminated Defendant's employment because, *inter alia*: (a) he had failed to adequately perform his primary task of growing and maintaining Plaintiff's service fee volume, (b) during the year prior to his termination of employment, Defendant's business development practices and efforts had radically and rapidly deteriorated, (c) he had failed to maintain effective and consistent contact with investment consultants and other primary product and service marketing services, (d) he had misled senior management regarding the nature and effectiveness of contacts which he had allegedly maintained with investment consultants and advisors, (e) he had failed to develop markets for very successful products and services which Plaintiff had developed, (f) he had deliberately misused Plaintiff's business credit card by charging to it tens of thousands of dollars of personal expenses, (g) he was deliberately insubordinate to Plaintiff's management by continuing to use Plaintiff's credit card for personal expenditures after having been specifically and repeatedly instructed not to do so, (h) he had lied to Plaintiff's management by representing that he had not used Plaintiff's business credit card for personal purposes immediately after Plaintiff had used it extensively for purchase of tens of thousands of dollars of personal items and (i) he had generally failed to do important tasks for which he was hired and which he proposed to do in the marketing program which he outlined to induce Plaintiff to retain him in the first instance.

60.    Plaintiff terminated Defendant's employment in St. Louis, Missouri by issuing Defendant a letter of termination on July 3, 2006.

61.    By July 19, 2006 following termination of Defendant's employment, Plaintiff had paid all compensation due to Defendant through his termination of employment.

## DEFENDANT'S COMPENSATION FROM PLAINTIFF

62.    Plaintiff provided Defendant a variety of employee benefits as described in Paragraph 52 above.

63.    Plaintiff paid Defendant a base salary of varying amounts which equaled or exceeded $200,000 per year on a bi-weekly basis.

64.    Plaintiff initially offered to pay to Defendant certain additional amounts as "commissions" based upon percentages of Plaintiff's service fee revenues as outlined in Defendant's Offer Letter.

65.    Shortly after Defendant was hired in April, 2002, Plaintiff and Defendant agreed that additional payments of compensation through "commissions," as described in the Offer Letter, would not be made to Defendant.

66.    In lieu of receiving payments of "commissions" as described in the Offer Letter, Plaintiff and Defendant instead agreed that Defendant would be granted a Class B membership interest in Plaintiff.

67.    This interest was granted to Defendant during May, 2002 and instead of receiving payments of commissions, Defendant became eligible to receive quarterly distributions of profits from Plaintiff's operation.

68.    As a result, during Defendant's entire period of employment with Plaintiff, Defendant did not receive any payments from Plaintiff which were denominated as, paid as or structured as "commissions."

69.    Instead and commencing on January 9, 2003, Defendant began receiving distributions of Plaintiff's profits as a Class B Member of Plaintiff.

70.    On January 9, 2003, Defendant first received a distribution of Plaintiff's profits for the calendar year ended December 31, 2002.

71.    Thereafter, Defendant received a distribution of Plaintiff's profits following the close of each calendar quarter.

72.    Pursuant to agreement between Plaintiff and Defendant, these distributions were made by reason of Defendant's Class B membership interest in Plaintiff and Plaintiff's Operating Agreement and for no other reason.

73.  ·  Pursuant to the Operating Agreement, Defendant had no specific right to any distributions of cash or property or allocations of income or loss.

74.    Pursuant to the Operating Agreement, any distributions of cash or property or allocation of income or loss made to Defendant, as a Class B member, were made to him on a totally discretionary basis by Plaintiff.

75.    Pursuant to Section 4.1 of Plaintiff's Operating Agreement, distributions would be made by Plaintiff in cash or other property only at such times and as recommended by the Manager of Plaintiff, Charles D. Walbrandt, and upon unanimous consent of all Class A Members.

76.    Pursuant to Section 4.2.2 of Plaintiff's Operating Agreement, profits for any period would be allocated to Members only at such times and as recommended by the Manager of Plaintiff, Charles D. Walbrandt, and upon approval by all Class A Members.

77.    Pursuant to Section 4.1 of Plaintiff's Operating Agreement, the actual amount of any distributions which may be made to any Member of Plaintiff would be determined pursuant to such methodology as may be developed by Charles D. Walbrandt after consultation with the Class A Members.

78.    While Defendant was a Class B Member, Plaintiff elected to allocate to Defendant, on a quarterly basis, a portion of Plaintiff's profits.

79.    This discretionary allocation of profits to Defendant was developed based upon application of the percentages to Plaintiff's service fee revenues as outlined in the Offer Letter to Defendant.

80.    The amounts allocated on a quarterly basis to Defendant as profits by reason of his Class B membership in Plaintiff were at least equal to amounts which would have been paid as "commissions" based upon percentages of Plaintiff's service fee revenues as outlined in Defendant's Offer Letter.

81.    The Manager determined, in his discretion, to make Plaintiff actually pay out to Defendant, on a quarterly basis, amounts allocated to Defendant as profits described above.

82.    While Defendant was employed by Plaintiff, these allocations of profit and payments were recommended to and approved by Plaintiff's Class A Members.

83.    Pursuant to Section 3.3 of the Operating Agreement, Plaintiff maintained a Capital Account for each of Plaintiff's Members.

84.    While Defendant was employed by Plaintiff and was a Class B Member of Plaintiff, Plaintiff credited (increased) Defendant's Capital Account with all quarterly allocations of profit which the Manager determined, and the Class A Members authorized, to make to Defendant.

85.    While Defendant was employed by Plaintiff and was a Class B member of Plaintiff, Plaintiff debited (decreased) Defendant's Capital Account with all quarterly distributions made to Defendant.

86.    Distributions made to Defendant equaled the amount of Plaintiff's profits which were allocated to Defendant.

87.    At the time of Defendant's termination of employment from Plaintiff, the balance of Defendant's Capital Account equaled zero because (a) the amount of distributions made to Defendant from Plaintiff equaled all profit allocations credited to his Capital Account and (b) no other credits were made, or should have been made, to his Account pursuant to the Operating Agreement.

88.    On July 19, 2006 and August 10, 2006 following Defendant's termination of employment, Plaintiff made final allocations of profits to Defendant for the second calendar quarter of 2006 which were recognized while Defendant was employed.

89.    On July 19, 2006 and August 10, 2006, Plaintiff paid the same sums to Defendant.

90.    Pursuant to Section 6.2 of the Operating Agreement, if Defendant ceased to be employed by Plaintiff for any reason, Plaintiff was obligated to redeem all of Defendant's Membership Interest in Plaintiff.

91.    Pursuant to Section 6.2 of the Operating Agreement, the value of the redemption price was set at an amount equal to the balance of Defendant's Capital Account on the date of Defendant's termination of employment.

92.    Upon termination of Defendant's employment by Plaintiff, the value of his Capital Account equaled zero.

93.    Accordingly, upon Defendant's termination of employment with Plaintiff, his Class B Membership interest with Defendant was redeemed and cancelled with no further payment due.

## DEFENDANT'S THREATENED CLAIMS AGAINST PLAINTIFF

94.    On January 2, 2007, Defendant, through his counsel, sent a letter (Appendix 1 attached hereto).

95.    In this letter (the "Demand Letter"), Defendant threatened to sue Plaintiff in Austin, Texas unless Plaintiff immediately paid to Defendant the sum of Fourteen Million Dollars ($14,000,000.00) plus interest at the rate of six percent (6%) from the dates on which the various components of that sum first became due.

96.    In Defendant's Demand Letter, Defendant alleged that he had a contract of employment with Plaintiff.

97.    Defendant, despite his prior agreement to receive profit distributions from Plaintiff by reason of his Class B membership in Plaintiff and despite no agreement existing which would provide compensation payments to Defendant following his termination from employment, Defendant alleged that Plaintiff still owed him continued payment of quarterly commissions following Defendant's termination of employment based upon percentages of Plaintiff's revenue yet to be earned by Plaintiff.

98.    Defendant demanded that he is owed Two Million Dollars ($2,000,000.00), plus interest, which equals Defendant's erroneous calculation of the present value of these commissions yet to be earned by Plaintiff after Defendant's termination from employment.

99.    In Defendant's Demand Letter, Defendant also contends that he is still an eight percent (8%) owner of Plaintiff.

100.    Defendant erroneously contends that this interest has a value of Twelve Million Dollars ($12,000,000.00).

101.    Defendant contends that because he was involuntarily terminated and "forced out" of Plaintiff's employment, Defendant is entitled to payment from Plaintiff of the alleged fair market value of his presumed membership interest of $12,000,000.00 plus interest.

102.    Defendant's Letter advised that unless Plaintiff immediately tendered payment to Defendant the sum of Fourteen Million Dollars ($14,000,000.00) plus interest, Defendant would institute suit against Plaintiff to collect this sum plus other legal and equitable remedies.

## COUNT I – REQUEST FOR DECLARATORY JUDGMENT ON BREACH OF EMPLOYMENT CONTRACT AND COMPENSATION OBLIGATIONS

103.    Plaintiff realleges and incorporates by reference ¶¶1 through 104 above.

104.    The facts and matters set forth above present a justiciable controversy and are ripe for adjudication, *inter alia*:

(a)    Plaintiff contends that it has never had an employment agreement with Defendant;

(b)     Plaintiff contends that its employment relationship with Defendant was at will and could be terminated at any time for any reason or no reason;

(c)     Plaintiff contends that the Offer Letter and Defendant's employment with Plaintiff did not create any post-termination of employment obligation to make any continued payments of commissions or compensation to Defendant;

(d)     Defendant contends that he had a contract of employment with Plaintiff;

(e)     Defendant contends that, pursuant to his alleged contract of employment with Plaintiff, he is entitled to immediate payment of Two Million Dollars ($2,000,000.00) in present value for commissions to be payable after Defendant's termination of employment based upon future earnings which may or may not be realized by Plaintiff;

(f)     Defendant has actually threatened immediate suit to establish the existence of an employment contract with Plaintiff which provides for payment of the aforementioned sum and to enforce and collect this sum;

107.     Pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57, Plaintiff is entitled to the declaratory relief set forth below.

WHEREFORE, Plaintiff prays this Court as follows:

(a)     To issue a declaratory judgment that Plaintiff has no employment contract with Defendant;

(b)     To issue a declaratory judgment that Plaintiff has paid all sums due to Defendant;

(c)     To issue a declaratory judgment that Plaintiff has no obligation to make payment of any compensation/commissions to Defendant after his termination of employment based upon future earnings which may or may not be realized by Plaintiff or otherwise;

(d)     To award Plaintiff its costs and attorneys' fees; and

(e)     To issue such other relief as the Court may deem just and proper.

## COUNT II – REQUEST FOR DECLARATORY JUDGMENT THAT DEFENDANT FUNDAMENTALLY BREACHED ANY CONTRACT WHICH MAY HAVE EXISTED

108.    Plaintiff realleges and incorporates by reference ¶¶ 1 through 107 above.

109.    This Count is alleged in the alternative to Count I in the event that this Court determines that a contract of employment, or a contract to pay commissions or other compensation to Defendant after his termination of employment with Plaintiff, actually existed.

110.    If it is determined that a contract of employment, or a contract to pay commissions to Defendant after his termination of employment with Plaintiff, actually existed, Defendant's actions described in Paragraph 61 so fundamentally breached his obligations of performance and fiduciary duties to Plaintiff that any further duties of employment or payment to Defendant ended upon Defendant's termination of employment with Plaintiff.

111.    The facts and matters set forth above present a justiciable controversy and are ripe for adjudication, *inter alia*:

(a)     Plaintiff contends that it has never had an employment agreement with Defendant;

(b)     Plaintiff contends that its employment relationship with Defendant was at will and could be terminated at any time for any reason or no reason;

(c)     Plaintiff contends that the Offer Letter and Defendant's employment with Plaintiff did not create any post-termination of employment obligation to make any continued payments of commissions or compensation to Defendant;

(d)     Plaintiff contends that if Plaintiff and Defendant did have a contract of employment or a contract to pay commissions to Defendant after his termination of employment with Plaintiff, Defendant's actions described in Paragraph 61 so fundamentally breached his obligations of performance and fiduciary duties to

Plaintiff that any further duties of employment or payment to Defendant ended upon his termination of employment;

(e)     Defendant contends that he had a contract of employment with Plaintiff;

(f)     Defendant contends that, pursuant to his alleged contract of employment with Plaintiff, he is entitled to immediate payment of Two Million Dollars ($2,000,000.00) in present value for commissions to be payable after Defendant's termination of employment based upon future earnings which may or may not be realized by Plaintiff;

(g)     Defendant has actually threatened immediate suit to establish the existence of an employment contract with Plaintiff which provides for payment of the aforementioned sum and to enforce and collect this sum.

112.     Pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57, Plaintiff is entitled to the declaratory relief set forth below.

WHEREFORE, Plaintiff prays this Court as follows:

(a)     To issue a declaratory judgment that Plaintiff has no employment contract with Defendant;

(b)     To issue a declaratory judgment that Plaintiff has paid all sums due to Defendant;

(c)     To issue a declaratory judgment that Plaintiff has no obligation to make payment of any compensation/commissions to Defendant after his termination of employment based upon future earnings which may or may not be realized by Plaintiff or otherwise;

(d)     To award Plaintiff its costs and attorneys' fees; and

(e)     To issue such other relief as the Court may deem just and proper.

## COUNT III – REQUEST FOR DECLARATORY JUDGMENT ON FAILURE TO REDEEM LIMITED LIABILITY COMPANY INTERESTS

113.    Plaintiff realleges and incorporates by reference ¶¶ 1 through 112 above.

114.    The facts and matters set forth above present a justiciable controversy and are ripe for adjudication, *inter alia*:

(a)    Plaintiff contends that upon Defendant's termination of employment with Plaintiff, Defendant's Class B membership interest was redeemable in an amount equal to the value of his Capital Account;

(b)    Plaintiff contends that at the time of Defendant's termination of employment, Defendant's Capital Account was valued at zero;

(c)    Plaintiff contends that Defendant, therefore, was not entitled to any further payment upon termination of his employment by Plaintiff for redemption of his Class B Membership in Plaintiff;

(d)    Accordingly, Plaintiff contends that Defendant has no further membership or ownership interest in Plaintiff;

(e)    Defendant contends that he continues to have an eight percent (8%) ownership interest in Plaintiff;

(f)    Defendant contends that upon his involuntary termination of employment, he was entitled to have his ownership interest in Plaintiff redeemed for its then fair market value;

(g)    Defendant contends that he is entitled to receive an immediate payment of Twelve Million Dollars ($12,000,000.00) as the value of his ownership in Plaintiff;

(h)    Defendant has directly threatened immediate suit to establish the existence of his ownership interest in Plaintiff, to establish the value of that interest at $12,000,000 and to enforce and collect this sum.

115.    Pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57, Plaintiff is entitled to the declaratory relief set forth below.

WHEREFORE, Plaintiff prays this Court as follows:

(a)    To issue a declaratory judgment that upon termination of Defendant's employment with Plaintiff, Defendant was only entitled to have his Class B membership interest redeemed for the value of his Capital Account at the date of his termination of employment;

(b)    To issue a declaratory judgment that the value of Defendant's Capital Account at termination of employment was zero;

(c)    To issue a declaratory judgment that Defendant has no current ownership or membership interest in Plaintiff;

(d)    To issue a declaratory judgment that Plaintiff has no further obligation to make payment of any sums to Defendant in redemption of his ownership or membership interests in Plaintiff;

(e)    To award Plaintiff its costs and attorneys' fees; and

(f)    To issue such other relief as the Court may deem just and proper.


WHEREFORE, for the reasons stated herein, Plaintiff should be awarded the relief sought above and such other relief whether legal, equitable or otherwise the Court deems appropriate.

Respectfully submitted,

THE LOWENBAUM PARTNERSHIP, LLC


/s/ Robert W. Stewart
Stanley G. Schroeder, ARN 24953
Robert W. Stewart, ARN 4463
222 South Central Avenue, Suite 901
Clayton, MO 63105
(314) 746-4835 – Direct
(314) 746-4825 – Direct
(314) 863-0092 - Main
(314) 746-4848 - Fax
sschroeder@lowenbaumlaw.com
rstewart@lowenbaumlaw.com

Attorneys for Plaintiffs

# SESSIONS LAMBERT SELWYN LLP

**Attorneys and Counselors**

**William Lewis Sessions, Partner**
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

Direct Telephone: (214) 217-8855
Direct Fax: (214) 217-8856
E-mail: lsessions@slslaw.net

✦ 1700 Pacific Avenue,
Suite 2260
Dallas, Texas 75201
Tel: (214) 217-8808
Fax: (214) 217-8851

1000 Smith Street,
Suite 4050
Houston, Texas 77002
Tel: (713) 650-3850
Fax: (713) 650-3851

slslaw.net

January 2, 2007

Mr. Joe Gallagher
Fiduciary Asset Management, LLC
8112 Maryland Ave., Suite 400
St. Louis, MO 63105

Re:  Jeff Swope Employment Agreement with Fiduciary Asset Management, LLC

Dear Mr. Gallagher:

Mr. Jeff Swope has engaged me and my firm to represent him in connection with his termination by Fiduciary Asset Management LLC ("FAMCO"). This letter is a formal demand that FAMCO immediately make payment to Jeff Swope for all sums due and owing to Mr. Swope under the terms of his employment agreement with FAMCO, payment of the current market value for the purchase of Mr. Swope's equity in FAMCO, and the immediate return of all of his personal property and effects that were wrongfully retained by FAMCO upon Mr. Swope's wrongful expulsion from FAMCO last summer.

As you must be aware, Mr. Swope was summarily terminated without cause on July 3, 2006 by Charles D. Walbrant after Mr. Swope's four plus years of employment with FAMCO. As of this writing, Mr. Swope is still owed compensation due to him under his employment agreement with FAMCO. Pursuant to the terms of that agreement, Mr. Swope is entitled to the payment of commissions on a quarterly basis as a percentage of revenues from assets raised. Mr. Swope, who brought billions of dollars in new assets to FAMCO during his tenure, is still owed the net present value of those earned commissions of approximately Two Million Dollars ($2,000,000), plus interest from October 15, 2006 on all unpaid amounts.

Additionally, Mr. Swope is the holder of eight percent (8%) equity in FAMCO. As of the June 2006 equity distribution notification delivered to Mr. Swope and five (5) of his colleagues, Mr. Swope's equity was valued at approximately Twelve Million Dollars ($12,000,000.00). Since he was involuntarily forced out of FAMCO, Mr. Swope is entitled to

Appendix 1

# SESSIONS LAMBERT SELWYN LLP

### Attorneys and Counselors

Mr. Joe Gallagher
January 2, 2007
Page 2 of 3

the payment of the fair market value of that equity as of the date of his separation from FAMCO, plus interest.

In addition, FAMCO perfunctorily forced Mr. Swope from his office and has refused to surrender to him many personal effects, art work, and files that have considerable tangible and intangible value. FAMCO has wrongfully retained possession, and effected a conversion, of Mr. Swope's personal effects, artwork, valued at over $100,000, a television and desk chair from his office. Further, while portions of his files were shipped to him, albeit at an incorrect address, there are a number of items missing that were apparently withheld, including FAMCO's March 2002 offer letter to Mr. Swope, the June 2005 equity distribution letter and several years of tax documents.

This letter also constitutes a formal demand for the immediate return of Mr. Swope's personal effects, including all missing papers from his files. Further, this letter constitutes a formal demand that FAMCO, its officers, directors, equity holders, employees, agents and all others acting in concert with FAMCO or under its direction or control refrain from destroying, altering, or spoiling any and all documents, data, and other tangible items that relate or pertain, directly or indirectly, with Mr. Swope, all information relating or pertaining to his work at FAMCO, all email and other communications relating or pertaining to Mr. Swope and his clients, and all business records and documents relating or pertaining to financial operations of FAMCO and commissions earned by to paid to members, equity holders, employees, agents and other persons employed or compensated by FAMCO, that came into existence since April 1, 2002.

Mr. Swope would prefer to avoid the necessity of filing a lawsuit to collect the amounts due and owing and to secure the return of his personal property. In order to avoid a lawsuit, which will be filed in Austin, Texas, formal demand is made that FAMCO immediately: 1) deliver all personal property belonging to Mr. Swope to this attorney's office, in the same condition as it was left with FAMCO; and, 2) immediately tender payment to Mr. Swope the amount of Fourteen Million Dollars ($14,000,000.00), plus interest at six (6) percent from the dates that each sum stated above became due and payable to Mr. Swope. In the event FAMCO fails to completely comply with this legal demand, we will recommend that Mr. Swope initiate a lawsuit naming FAMCO and all responsible parties as defendants, seeking an accounting of the value of FAMCO and all amounts owed to Mr. Swope, recovery of the principal amounts due and owing, return of his personal property and files, plus the maximum allowable interest, court costs, and reasonable attorney's fees.

Please promptly and courteously comply with this request so that FAMCO may avoid the unpleasant and costly experience of litigation. In the event that you desire to

# SESSIONS LAMBERT SELWYN LLP

### Attorneys and Counselors

Mr. Joe Gallagher
January 2, 2007
Page 3 of 3

communicate with Mr. Swope or this attorney, please do so at the address or phone number
stated above.

Sincerely,

William L. Sessions

WLS:ep

Copy: Mr. Jeff Swope

ḷḷ,ḷ,,,ıllıı,,ılllı,,,llıılıılı,ıll,ılıl,,ı,lıı,ıllııl,ıɪlııl

*Sender: Please print your name, address, and ZIP+4 in this box •*

Mr. Matthew B. Robinson
The Lowenbaum Partnership, L.L.C.
222 South Central Avenue, Suite 901
St. Louis, MO 63105

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X                                       ☐ Agent
                                        ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

1. Article Addressed to:

Mr. Jeffrey O. Swope
210 East 68th Street, Apt. 8AB
New York, NY  10021

3. Service Type
☑ Certified Mail      ☐ Express Mail
☐ Registered         ☒ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)   7001 0360 0003 9252 4716

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0952

FMS/Swope



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

FIDUCIARY ASSET MANAGEMENT, LLC,　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　　)　　Civil Action No. 4:07-cv-301-HEA
vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
JEFFREY O. SWOPE,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　)

**AFFIDAVIT OF ROBERT AKIN**

STATE OF NEW YORK　　　　　)
　　　　　　　　　　　　　　　) SS
COUNTY OF NEW YORK　　　　　)

I, Robert Akin, duly sworn upon my oath, state as follows:

1.　　　　I am over 18 years of age and competent to testify to the matters stated in this affidavit. I am not a party to the above-captioned matter.

2.　　　　I am a licensed process server in the state of New York. My office is located at 536 East 14th Street, Suite 1, New York, NY 10009.

3.　　　　I was engaged by Matthew B. Robinson of The Lowenbaum Partnership, L.L.C. to serve process upon the defendant, Jeffrey O. Swope ("Swope").

4.　　　　Mr. Robinson provided me with two original summons and two copies of the complaint in the above-captioned matter in order for me to effect service upon Swope.

5.　　　　At approximately 4:00 p.m. on April 4, 2007, I traveled to the building located at 210 East 68th Street, Apt. 8AB, New York, NY 10021. I spoke with the doorman in the

EXHIBIT
3

building. He confirmed that Swope resided there and phoned the apartment. He stated that there was no answer and I said that I would return at a later time.

6.      At approximately 2:00 p.m. on April 5, 2007, I again traveled to the building located at 210 East 68th Street, Apt. 8AB, New York, NY 10021. The doorman of the building confirmed that Swope lived at this address with his family, but indicated Swope and his family were currently out of town. The doorman stated that he knew this because there was a cell phone that Swope had not picked up and that there had been no trash to pick up outside of the apartment for several days.

7.      On April 27, 2007, I received a second summons from Mr. Robinson with a request for me to attempt service on Mr. Swope.

8.      On April 30, 2007, I again attempted service on Swope at the East 68th Street address. The doorman called the apartment and did not receive an answer.

9.      On May 3, 2007, I again attempted service on Swope. The doorman called the residence and stated that Swope was not answering.

10.     On May 12, 2007, I entered the building and proceeded to the elevator. I took the elevator to the 8th floor and located the door for Swope's apartment. I proceeded to attach a copy of the summons and complaint to the front door. I then departed from the building.

11      On May 14, 2007, I sent a copy of the summons and complaint via certified mail with a return receipt, to Swope at the same address.

12.     On May 21, 2007 after returning from a job out of town I saw that I had received the return receipt, signed for and accepted at Swope's address.

2

I, Robert Akin, have read and understood the preceding twelve numbered paragraphs. I confirm their truth and accuracy by my personal knowledge.

_____
Robert Akin

STATE OF NEW YORK          )
                           )    ss
COUNTY OF NEW YORK         )


Subscribed and sworn personally before me on this 27th day of July 2007.

_____
Notary Public

My commission expires:

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Trisha L. Kitchen, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires Mar. 10, 2009
Member, Pennsylvania Association of Notaries

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FIDUCIARY ASSET MANAGEMENT, LLC,    )
                                     )
            Plaintiff,               )
                                     )    Civil Action No. 4:07-cv-301-HEA
vs.                                  )
                                     )
JEFFREY O. SWOPE,                    )
                                     )
            Defendant.               )

AFFIDAVIT OF JAMES GRIFFITH

STATE OF TEXAS          )
                        ) SS
COUNTY OF TRAVIS        )

I, James Griffith, duly sworn upon my oath, state as follows:

1.      I am over 18 years of age and competent to testify to the matters stated in this

affidavit. I am not a party to the above-captioned matter.

2.      I am a licensed process server in the state of Texas. My office is located at

Centex Pro Solutions, 108 West 38th Street, Austin, Texas 78705.

3.      I was engaged by Corey Franklin of The Lowenbaum Partnership, L.L.C. to serve

process upon the defendant, Jeffrey O. Swope ("Swope").

4.      Mr. Franklin provided me with an original summons and a copy of the complaint

in the above-captioned matter in order for me to effect service upon Swope.

5.      At approximately 10:00 a.m. on April 7, 2007, I traveled to the house located at

4011 Westlake Drive, Austin Texas 78746 to attempt service on Swope. When I arrived at the

residence there was no answer when I knocked on the door and there were no cars present in the

driveway.



6. At approximately 1:15 p.m. on April 7, 2007, I traveled to the house located at 4011 Westlake Drive, Austin, Texas 78746 to attempt service on Swope. When I arrived at the residence there was no answer when I knocked on the door. There were two cars parked in the driveway at this time.

7. At approximately 7:30 p.m. on April 7, 2007, I traveled to the house located at 4011 Westlake Drive, Austin, Texas 78746 to attempt service on Swope. When I arrived at the residence I knocked on the door and a man answered. I asked for Swope and he told me that he was not home at the moment, but that he would be back later. He then asked whether there was anything he could do for me. I told him no thank you, that the matter was for Mr. Swope, and that I need to discuss it with Mr. Swope personally. I then asked him what time Mr. Swope would be home. At this point he asked me what the matter was about and I explained that I could not give out that information. He yelled "you are a god damned process server!" at which point he told me that Swope would not be returning and slammed the door in my face.

8. At approximately 2:00 p.m. on April 8, 2007, I traveled to the house located at 4011 Westlake Drive, Austin, Texas 78746 to attempt service on Swope. When I arrived at the residence there was no answer when I knocked on the door. After about 30 seconds, however, I could hear people talking on the other side of the door and the locks were engaged on the door. They then told the dog to be quiet. There were four cars parked in the driveway at this time. Per my clients instructions, I remained at the house until 10:00 p.m. to see if anyone left the house. No one left the residence the entire day.

9. At approximately 1:00 p.m. on April 9, 2007, I traveled to the house located at 4011 Westlake Drive, Austin Texas 78746 to attempt service on Swope. When I arrived at the

2

residence there was no answer when I knocked on the door. Per my clients' instructions, I

attached the Original Summons and Complaint to the front door of the residence.


I, James Griffith, have read and understood the preceding nine numbered paragraphs. I

confirm their truth and accuracy by my personal knowledge.

_____

James Griffith

STATE OF TEXAS              )
                           )  ss
COUNTY OF TRAVIS           )


Subscribed and sworn personally before me on this _16_ day of July 2007.

NORMAN WILEY
Notary Public, State of Texas
My Commission Expires
AUG. 3, 2009

_____

Notary Public

My commission expires: 8/3/09

3