UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JEFFREY O. SWOPE,                              :
                                               :
                              Plaintiff,       :   Case No. 07-CV-6921 (BSJ)
                                               :
              vs.                              :
                                               :   (*ECF Case*)
FIDUCIARY ASSET MANAGEMENT, L.L.C.,            :
                                               :
                              Defendant.       :
                                               :
------------------------------------------------------------- X

### AFFIDAVIT OF CHARLES D. WALBRANDT

I, Charles D. Walbrandt, duly sworn upon my oath and of lawful age, state as follows:

1. My name is Charles D. Walbrandt, and I serve as Chief Executive Officer and Chief Investment Officer for the defendant, Fiduciary Asset Management, L.L.C. (the "Company" or "FAMCO"), in the above-referenced matter. I have served in this capacity for approximately thirteen years. I have been asked to give this affidavit in connection with the foregoing lawsuit of which I have been made aware.

2. I have been employed by the Company since its inception as its President, Chairman, and sole owner of its voting shares prior to its conversion to a limited liability company and sole holder of its Class A voting membership interests since it became a limited liability company.

3. I have developed personal knowledge of the contents of this affidavit through my employment as President and Chairman for the Company. I am fully competent to testify to the matters set forth in this affidavit.

4. The Company paid a substantial fee to Swope for relocating from New Orleans, Louisiana to St. Louis, Missouri so that Swope could be available at the St. Louis, Missouri headquarters of the Company.

5. Swope moved to St. Louis and rented an apartment in St. Louis, Missouri for a substantial portion of his employment by the Company. In fact, Swope's 2002 Federal Tax Form W-2 from the Company was mailed on January 31, 2003 to Swope's residence at 817 Westwood Drive, Unit 2W, St. Louis, Missouri 63105. Swope's 2003 Form W-2 was mailed by the Company on January 31, 2004 to Swope's residence at 6 Berkshire Drive, Richmond Heights, Missouri 63117. Swope's 2004 Form W-2 was mailed by the company on January 31, 2005 to his residence at 1221 7th Street, New Orleans, Louisiana 70115. Swope's 2005 Form W-2 was mailed by the Company to his residence at 901 West 9th Street, Unit 410, Austin, Texas 78703. On January 31, 2007, several months after Swope's employment was terminated, his 2006 W-2 was mailed to 210 East 68th Street, Unit 8A, New York, New York 10021, but the state withholding was for a Texas resident as Swope directed.

6. On July 3, 2006, Swope was terminated by the Company. On July 13, 2006, Swope e-mailed Joseph Gallagher, Chief Operating Officer of the Company, indicating that his lease in Austin, Texas terminated at the end of June, 2006. The attached Exhibit A is a true and accurate copy of the aforementioned e-mail.

7. It was not until July 17, 2006, after Swope's termination, that he provided the 10 Liberty Street, Apt. 44E, New York, New York 10005 address. The attached Exhibit B is a true and accurate copy of the aforementioned e-mail.

8. As of May 10, 2006 the Company believed that Swope was working out of his home in Austin, Texas. The attached Exhibit C is a true and accurate copy of the e-mail

reflecting this belief. Further, the Company did not withhold any New York income tax from Swope's compensation and treated him as a Texas resident for all of 2006 and withheld no income taxes based upon his Texas residency, per Swope's instructions

9. On January 19, 2006, Swope e-mailed the Company indicating his permanent address was in Texas. The attached Exhibit D is a true and accurate copy of the aforementioned e-mail.

10. Swope did not generate any New York clients for the Company.

11. Swope states in paragraph 5 of his August 23, 2007 affidavit ("Affidavit") that he "developed a great deal of business relationships on behalf of FAMCO with a number of companies based in or actively doing business in New York." Swope then lists 31 companies, funds, and organizations with which Swope contends that he developed business relationships for the Company. With two exceptions, General Motors Asset Management ("GMAM") and L.I.C.R. Fund, Inc. ("LICR"), the Company has never had any business relationship with any of the other 29 organizations identified. The Company has never had any meetings with them, it has never received a request to propose doing business with any of them, it has never actually submitted a request for proposal to do business with any of them, has never actually performed any services for them, has not ever generated any revenue from any relationship with them, and does not now, nor has it ever, had any sort of business relationship or continuing or even irregular contact relationship with any of them.

12. The Company has done business with GMAM and LICR.

13. With respect to GMAM, the Company was doing business with it prior to Swope joining the Company. Although an additional relationship developed after Swope joined the Company, the new relationship resulted from GMAM's initiative and Swope undertook no

3

actions which improved or enhanced the relationship. As to LICR, this organization actually contacted the Company to solicit a proposal to manage money for it. LICR obtained information from published sources regarding the Company's track record in asset management and contacted the Company to arrange for a proposal which ultimately led to LICR becoming a client. The Company does manage LICR assets from St. Louis. Swope may have attended a meeting with an investment professional after LICR contacted the Company, but did not play a material role in obtaining this client and Swope was not considered by LICR to be a material participant.

14.     Again, at paragraph 8 of Swope's Affidavit, he identified 46 meetings and conversations that he had with New York clients or contacts. With one exception, Rockefeller Brothers Fund, no client relationships resulted from any of the other organizations listed in the other 45 contacts which Swope alleges he had. With respect to these other 45 contacts, the Company has had only one meeting each with Vulcan Capital and Pinnacle Asset Management which involved a general discussion of master limited partnership investing. No business, client relationship, subsequent meetings, or fees resulted or followed. The Company has also had meetings or spoken with representatives from Morgan Stanley, CSFB, Overture, Merrill Lynch, J.P. Morgan Chase, Credit Suisse, Goldman Sachs, Bank of America, and UBS from time to time. None of these meetings referred to by Swope, however, resulted in any client relationships, contracts, business relationships, or fees.

In the case of Messrs. Rye of Merrill Lynch, Wood and Gould at Morgan Stanley, and Patel at Bank of America, the introductions to these individuals were made by Company representatives to Swope; he did not identify them for the Company. In the case of these individuals, FAMCO is the customer and these firms receive business from FAMCO. No

business or revenues ever came to the Company as a result of Swope's contact with these individuals.

With regard to the other 34 contacts, the Company never had any meetings with them, it has never received a request to propose doing business with any of them, it has never actually submitted a request for proposal to do business with any of them, has never actually performed any services for them, has not ever generated any revenue from any relationship with them, and does not now, nor has it ever, had any sort of business relationship or continuing or even irregular contact relationship with any of them.

15. With respect to Rockefeller Brothers Fund, furthermore, Swope did not generate the initial contact nor did he play a significant role in developing that business relationship for the Company, although he participated in one or two meetings in which the Company's investment professionals were the primary spokespersons.

16. Swope attached a document he represents as his "meeting log" at Exhibit C of his Affidavit and makes representations at paragraph 8 of his Affidavit regarding meetings he attended and calls which he allegedly made that are presumably substantiated by his meeting logs. We noted the following discrepancies between his affirmations and the meeting logs produced at Exhibit C to his Affidavit:

- In Swope's Affidavit at ¶8(e), he represents meeting in New York with Timothy Kiernan on November 18, 2005. Exhibit C attached to Swope's Affidavit includes no such meeting for November 18, 2005.
- In Swope's Affidavit at ¶8(oo), he represents having a meeting in New York with Bill Williams of Merrill Lynch on May 25, 2006. Exhibit C attached to Swope's Affidavit instead reflects that Swope was in Austin, Texas and San Antonio,

5

Texas on May 26, 2005, not in New York; and Swope's Exhibit C instead shows a telephone call with Bill Williams in Houston, not New York.

- In Swope's Affidavit at ¶8(pp), he represents meeting in New York with Jenny Jung of Bank of America on May 25, 2006. Again, Exhibit C attached to Swope's Affidavit instead reflects that Swope was in Austin, Texas and San Antonio, Texas on May 25, 2006, not in New York.

17. I never met with any representative of AIG in connection with the potential sale of FAMCO and did not have multiple meetings with Steve Neamitz of AIG as described in paragraph 9 of Swope's Affidavit. I am not aware that any discussions regarding an acquisition of FAMCO by AIG had ever "quickly progressed to the board level" as described in paragraph 9 of Swope's Affidavit.

18. Swope represents in paragraph 10 of his Affidavit that he arranged for me to meet with representatives of UBS. The purpose of the meeting was to explore UBS' interest in offering to its national clients mutual funds for which FAMCO would serve as sub-advisor, not to talk about selling the Company.

19. Contrary to Swope's representations in paragraph 12 of his Affidavit, the Company did not receive an offer from New York Life to purchase the Company.

20. Contrary to Swope's representations in his Affidavit, he did not arrange for any firm to become involved in any process relative to the acquisition of FAMCO. Swope was not involved in any authorized negotiations regarding acquisition of FAMCO by any entity. Moreover, Swope was not authorized to engage in any negotiations or discussions with any entities regarding a potential sale of FAMCO, nor was he authorized to "shop" FAMCO to prospective buyers or to solicit prospective buyers for the business. Swope had no role in

negotiating or arranging for the sale of the Company, nor did he have any authorized role in acquiring nor contacting potential purchasers for the Company.

21. Swope's employment contract was not negotiated in New York.

22 The Company did not approve of Swope residing in New York and did not direct him to move to New York. The Company was not aware that Swope had moved his residence to New York until after his employment had ended.

23. The attached Exhibit E is a June 2006 expense report from the Company's American Express card that Swope used for business travel. It shows that on June 2, 2006, Swope charged a hotel room at the Four Seasons Hotel in New York on the Company's credit card and submitted it for reimbursement as a business expense.

24. The attached Exhibit F is an April 2006 expense report from the Company's American Express card that Swope used for business travel. It shows that on March 23, 2006, Swope charged an airline ticket, sought reimbursement for it as a business expense, and described the expenditure as being for "[t]ravel home following meetings in NYC." Attached as Exhibit G is a portion of an expense report from the American Express credit card revealing Swope traveled from New York to New Orleans, Louisiana on that flight.

25. The attached Exhibit H is a bill turned in by Swope for reimbursement for business travel expenses from the Four Seasons Hotel in New York. It reflects Swope staying in a New York hotel room between May 30, 2006 and June 1, 2006 for business travel.

26. The attached Exhibit I is a portion of the bill from the Company's American Express card that Swope used for business expenses and reflect his charges. It shows that on May 23, 2006, Swope had an airline ticket from New Orleans, Louisiana to Austin, Texas. On

May 26, 2006, it shows that Swope flew from Los Angeles, California to New Orleans, Louisiana.

27. The attached Exhibit J is the relevant portion of an expense management report from the Company's American Express card that Swope used for business expenses, showing Swope's charges to the credit card. It shows that on November 22, 2005, Swope charged invoice for a stay at the Four Seasons Hotel in New York as a business expense.

28. In conjunction with the Company's sale to Piper Jaffray, the negotiation of that transaction was performed in St. Louis at the Company's facilities both in person and by telephone with Piper Jaffray personnel from its Minneapolis, Minnesota headquarters and its Minnesota counsel as well as Company personnel located in St. Louis and the Company's counsel who were also located in St. Louis.

29. The negotiations with Piper Jaffray regarding sale of the Company did not involve any of Piper Jaffray's personnel who may be located in New York, nor did it involve any entities or persons located in New York.

I, Charles D. Walbrandt, have read and understood the preceding twenty-nine numbered paragraphs. I confirm their truth and accuracy by my personal knowledge.

*Charles D. Walbrandt*
Charles D. Walbrandt

STATE OF MISSOURI    )
                     )  ss
COUNTY OF ST. LOUIS  )

Subscribed and sworn personally before me on this 10th day of September 2007.

NANCY R. SCHAEFER
Notary Public – State of Missouri
County of St. Louis
My Commission Expires May 25, 2008

8