UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

JEFFREY O. SWOPE,

               Plaintiff,

    -against-

FIDUCIARY ASSET MANAGEMENT, LLC,

           Defendant.

------------------------------------ x

**JURY TRIAL DEMANDED**

Case No. 07-CV-6921 (BSJ)

## FIRST AMENDED COMPLAINT

Plaintiff, Jeffrey O. Swope ("Plaintiff" or "Mr. Swope"), by his attorneys, Crosby & Higgins LLP, complaining of Defendant, Fiduciary Asset Management, LLC ("Defendant" or "FAMCO"), alleges on information and belief as follows:

### I. INTRODUCTION

1. This is an action for compensatory and punitive damages, as well as equitable relief, arising out of Defendant's scheme to wrongfully retain at least $1.3 million dollars in commissions owed to Plaintiff Jeffrey O. Swope, and then cheat him out of his 8% ownership interest in the proceeds from the recently closed sale of FAMCO to the Piper Jaffrey Companies—a sale that valued FAMCO at as much as $66 million dollars or more. Mr. Swope also seeks damages resulting from the loss of property wrongfully converted by FAMCO when Swope's employment was terminated.

2. In March 2002, Mr. Swope entered into an employment agreement with FAMCO and joined its senior management team as a Senior Vice-President in charge of marketing and

developing relationships for FAMCO with major institutional investors, the majority of which were headquartered in, or actively doing business in New York City. Pursuant to the terms of the parties' agreement, Mr. Swope was guaranteed a base salary, as well as a six year schedule of trailing commissions on the assets that Mr. Swope raised for FAMCO, with the commission amounts calculated based on FAMCO's quarterly billing of management fees.

3. Mr. Swope performed his end of the bargain exceedingly well, raising significant assets for FAMCO from at least 20 institutional investors, which in turn generated substantial management fees for the company. As a result, Mr. Swope earned and became entitled to significant commission payments from FAMCO, which were calculated in accordance with the terms of the commission schedule set forth in the parties' agreement, and which were paid each and every quarter, until FAMCO terminated Mr. Swope in June 2006.

4. In or about Spring 2005, FAMCO's Chief Executive Officer, Charles D. Walbrandt, decided to sell the company, and as a result, Mr. Swope began meeting on FAMCO's behalf with investment bankers and potential acquirers, many of whom did business in the New York City region, in order to discuss a possible sale of the company. It was also at or about this time that Mr. Walbrandt wrote to Mr. Swope and four other key senior FAMCO management employees awarding each of them an 8% equity ownership interest in FAMCO. FAMCO granted this equity ownership as an inducement to, and as consideration for, their continued efforts in support of a sale of FAMCO, and to maintain stability and continuity in FAMCO's management team as FAMCO entered into sale negotiations with potential acquirers.

5. Acting in reliance on FAMCO's grant of an 8% equity ownership interest to him, Mr. Swope continued his efforts to raise assets and grow FAMCO's institutional client base, while actively working on FAMCO's behalf to facilitate a sale of the company. In furtherance of those

2

efforts, in or about November 2005, Mr. Swope rented an apartment in New York City, in order to reduce business travel time and expense, and thereby more efficiently perform his business development activities in New York on behalf of FAMCO, as well as to more effectively facilitate numerous potential FAMCO sale discussions.

6.  In addition, at our about this time, and again acting in reliance on his status as an 8% equity owner of the company, Mr. Swope agreed to a request by FAMCO's Chief Operating Officer Joe Gallagher, to reduce Mr. Swope's base salary by $25,000, in order to help improve the appearance of FAMCO's net earnings, and thereby increase FAMCO's potential valuation in sale discussions with interested acquirers.

7.  Mr. Swope continued his efforts through the fourth quarter of 2005, and into the first and second quarter of 2006.  Indeed, working on FAMCO's behalf in New York City, Mr. Swope was able to arrange or participate in discussions with a number of potential acquirers, including a company called New York Life, which made a serious offer for FAMCO, in or about the first quarter of 2006, that Mr. Walbrandt decided not to pursue.

8.  In June 2006, Mr. Swope got married and left on a two-week trip to celebrate the marriage. In his absence, FAMCO terminated Swope without cause or warning.  Upon his return, Mr. Swope was excluded from FAMCO's offices and was not even given time to collect his belongings from his office, including personal files and valuable artwork.  Neither was Mr. Swope subsequently reimbursed for approximately twenty thousand dollars worth of authorized business expenses.

9.  Since terminating Mr. Swope and making payment of his second quarter 2006 commissions, FAMCO has likewise refused to pay Mr. Swope the quarterly commissions owed to him pursuant to the express terms of the parties' agreement, despite Mr. Swope's demand that

those commissions be paid.  In addition, FAMCO continued negotiating for a sale of the company, and several months after terminating Mr. Swope, entered into a definitive sale agreement with Piper Jaffray, which closed on September 14, 2007, for as much as $66 million dollars or more.

10. In its 8K filing announcing the closing of the FAMCO acquisition, Piper Jaffray identified the sellers of FAMCO as Mr. Walbrandt, and the other four employees granted an equity ownership interest.  Mr. Swope, however, was not identified as a seller of FAMCO. Meanwhile, FAMCO has failed to purchase back Swope's 8% interest in the company, or paid to Mr. Swope any distribution at all in relation to the sale to Piper Jaffray. Instead FAMCO has apparently converted Mr. Swope's equity and now claims that Mr. Swope has no ownership interest whatsoever in FAMCO.

## II.    PARTIES

11. Plaintiff Jeffrey O. Swope is a resident of New York and resides in New York City.

12. Defendant Fiduciary Asset Management, LLC, is a limited liability company, organized under the laws of the State of Missouri, having its principal place of business at 8112 Maryland Avenue, Ste. 400, St. Louis (Clayton), Missouri, 63105.  Service upon Defendant may be made upon its registered agent, Charles D. Walbrandt, at 8112 Maryland Avenue, Ste. 400, St. Louis, Missouri, 63105.

13. In or about Spring 2007, FAMCO entered into a definitive sale agreement with the Piper Jaffray Companies, an investment management company headquartered in Minneapolis, Minnesota.    According to an 8K Securities Exchange Commission filing, Piper Jaffray completed the purchase of FAMCO on September 14, 2007.  Piper Jaffray is a foreign

corporation registered to do business within the State of New York, and regularly does business in and maintains several offices in New York City, New York.

## II. JURISDICTION AND VENUE

14. Jurisdiction is appropriate over Defendant under § 301 of the New York Civil Practice Law and Rules ("CPLR"), as Defendant does business within the State as a result of usual, regular and systematic activities within the State.

15. Jurisdiction is also appropriate over Defendant under § 302 of the New York Civil Practice Law and Rules ("CPLR"), as Defendant: 1) transacts business within the State and contracts to supply goods or services in this State; 2) regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this State; and 3) committed tortious acts outside this State causing injury to Plaintiff in this State.

16. Venue is proper in the Court as a substantial amount of the events set forth herein took place in New York City, New York and the Plaintiff resides in New York City, New York.

## III. FACTUAL BACKGROUND

17. Until September 2007, FAMCO was an independent, employee-owned, registered investment advisor limited liability corporation. It currently claims to manage several billion dollars in investment assets for institutional, corporate, endowment and foundation, Taft-Hartley and private wealth clients.

18. Prior to joining FAMCO in 2002, Mr. Swope was a Managing Director with ICRM in San Francisco and a Vice President of Institutional Marketing with Provident Investment Counsel in Pasadena, California. He holds a Bachelor of Arts in Economics from the Frost School of Business at Centenary College. He is a member of the CFA Institute, and Association

for Investment Management Sales Executives (AIMSE) and has passed the NASD Uniform Securities Agent State Law (Series 63), the General Securities Representative (Series 7), and the Uniform Investment Advisor Law (Series 65) examinations. He has worked in the investment industry his entire career, and has held senior management positions with securities brokerage, trust, and investment management firms.

19. Mr. Swope first learned of an employment opportunity with FAMCO sometime in 2002 from Michael Martinolich, of Cromwell Partners, an executive employment recruiter located in New York City. As part of the recruitment process, Mr. Martinolich assisted the parties with the negotiation of the terms and conditions of employment, including the commission payments that Mr. Swope was to receive as part of his compensation with FAMCO.

20. On or about March 29, 2002, FAMCO made a written offer of employment to Mr. Swope. In the offer of employment, Mr. Swope was guaranteed, among other things, commission on revenue from assets he raised for FAMCO, based on quarterly billing of fees to FAMCO clients. The employment offer Mr. Swope received specifically outlined that he would be paid his commissions on a sliding scale percentage basis over the course of six years, such that Mr. Swope would receive 15 percent of the quarterly fees in the first year, 10 percent of the quarterly fees in the second year, 5 percent of the quarterly fees in the third year, and 2 percent of the quarterly fees in the fourth through sixth year.

21. Mr. Swope's right to receive this stream of commission payments was not, and in no way could be, tied to Mr. Swope's continued employment with FAMCO. Instead, Mr. Swope's right to receive the commission payments was earned at the time that Mr. Swope procured the client, after which, Mr. Swope was entitled to receive the structured commission payments set forth in

the employment offer over a period of six years, irrespective of whether Mr. Swope remained employed at FAMCO.

22. In addition to earning commission payments, Mr. Swope was guaranteed a substantial base salary by FAMCO, and was also told of the potential for ownership in the company as well. Mr. Swope accepted FAMCO's offer of employment, and began work in April 2002, in New Orleans, Louisiana, as Senior Vice President, Director of Marketing and Client Relations.

23. Prior to hiring Mr. Swope, FAMCO had never had an internal marketing department. Because it had for many years lacked substantial growth in assets, it instituted a marketing department and made a conscious decision to hire someone of Mr. Swope's experience to bring in institutional investors and hence, more revenue to the company. As a result, for most of his employment, Mr. Swope's position with FAMCO largely involved marketing and developing relationships for FAMCO with major institutional investors that could benefit from FAMCO's asset management products, the vast majority of which were headquartered in, or otherwise did business in, the New York City region.

24. Throughout his four years as the Director of Marketing and Sales, Mr. Swope did precisely what he was contracted to do. Mr. Swope brought into FAMCO over twenty institutional clients, which in turn brought in substantial annualized revenue in excess of five million dollars each year for FAMCO. Some of the institutional investors Mr. Swope brought into FAMCO, including brokerage firms, did so as a direct result of working relationships Mr. Swope established or cultivated in New York City.

25. Additionally, throughout the course of his employment, Mr. Swope regularly marketed FAMCO's products and services, through telephone calls and in-person meetings, to a number of companies based in or actively doing business in New York, including Avon Products, Inc.,

7

Colgate-Palmolive Company, Consolidated Edison Company of New York, Inc., Deutsche Bank North America Holding Corporation, Fiat North America, Ford Foundation, General Motors Asset Management, Goldman, Sachs & Co., Guardian Life Insurance of America, ITT Industries, Inc., JP Morgan Chase & Co., KeySpan Corporation, L.I.C.R. Fund, Inc., Loews Corporation, Memorial Sloan-Kettering Cancer Center, New York Life Insurance Co., New York Times Company, New York University, Novartis Corporation, Pentegra Retirement Services, PepsiCo, Inc., Pfizer, Inc., Philips Electronics North America Corporation, Reed Elseveir, Inc., Siemens Corp., The Church Pension Fund & Affiliates (Episcopal), The Metropolitan Museum of Art, The Rockefeller University, The Wallace Foundation, Time Warner, Inc., United Church of Christ Pension Boards, and YMCA Retirement Fund.    At FAMCO's direction, Swope systematically and continuously marketed FAMCO's products and services to these, and many other New York-based institutional investors, for the express purpose of generating sales of FAMCO's product offerings.

26. At some point early in Mr. Swope employment, FAMCO advised Mr. Swope that it did not want to pay the taxes associated with Mr. Swope's substantial commission checks, and as a result, formed an "S" corporation on his behalf, to process commission payments. However, at no time did the parties even discuss, let alone agree, to any modification of Mr. Swope's employment agreement with FAMCO, or his right to receive commissions. Instead, FAMCO and Mr. Swope expressly understood and agreed to continue to be bound by and follow the commission schedule set forth in the parties' agreement.

27. As a result, throughout the entire course of his employment, Mr. Swope was entitled to, and was in fact regularly paid commissions on FAMCO's revenue from the clients Mr. Swope procured, on a sliding scale commission structure for "Yr 1", "Yr 2," "Yr 3," and "Yrs 4-6," all

8

in accordance with the express terms of the parties' agreement. To illustrate, Mr. Swope's first quarter 2006 "commission schedule" from FAMCO reflects Mr. Swope's commissions calculated according to the commission structure contractually agreed upon by the parties, and also reflects approximately ten of the institutional clients for which commissions were paid to Mr. Swope, and which were located and serviced by FAMCO in New York.

28. In the beginning of 2005, FAMCO's CEO, Charles D. Walbrandt, confided that he wanted to sell the company and asked Mr. Swope whether he had any potential contacts that would be interested. Mr. Swope introduced Mr. Walbrandt to the investment banking division of New York-based UBS AG to discuss a possible sale of the company, ultimately culminating in UBS being retained by FAMCO for investment banking services, in or about May of 2005. Mr. Swope also introduced Mr. Walbrandt to Steve Neamtz, president of AIG SunAmerica, and FAMCO subsequently held discussions with AIG regarding AIG's possible purchase of FAMCO.

29. Acknowledging the benefits that Mr. Swope had contributed to FAMCO, and as an inducement to, and consideration for, his continued efforts on behalf of FAMCO, including assisting with the sale of the company, and in order to keep FAMCO's senior management team stable and intact in anticipation of a buyout, in or about June 2005, Mr. Walbrandt wrote a letter to Mr. Swope awarding him, and four other key senior FAMCO management employees, Joseph Gallagher, Wiley Angell, Mohammad Riad, and Jim Cunnane, an 8% equity interest each in the company, which in the aggregate, constituted 40% of FAMCO's equity. At least two of these employees helped start FAMCO, and worked previously with Mr. Walbrandt at General Dynamics.    Another employee's father was on the advisory board of FAMCO and had

9

previously served as the Chief Financial Officer of General Dynamics with Mr. Walbrandt. The remaining employee was Mr. Walbrandt's son-in-law.

30. At the time FAMCO transferred an 8% equity interest to each of these individuals, Mr. Walbrandt estimated that 8% of the company would be valued at approximately thirteen million dollars. He specifically told Mr. Swope that FAMCO would work out a structure with the buy-out company that would require it to buy a portion of Mr. Swope's 8% ownership interest in cash, up front, and provide for equity in the acquiring company for the remaining portion, which over time, could be sold back and redeemed for cash.

31. In September 2005, Joe Gallagher, the Chief Operating Officer of FAMCO, advised Mr. Swope that FAMCO wanted to reduce his salary by twenty-five thousand dollars in order to improve FAMCO's earnings before interest, taxes, depreciation, and amortization prior to the sale of the company. In an effort to help the company appear as attractive as possible prior to sale, and in consideration of the June 2005 equity grant, Mr. Swope agreed to the reduction in his salary.

32. Mr. Swope was a resident of New Orleans, Louisiana, during August 2005, when Hurricane Katrina hit the gulf-coast region. The losses from the hurricane to Mr. Swope's home and the office he kept in New Orleans for FAMCO were severe and nearly all of his personal and work-related documents, records, and computer equipment were either destroyed or damaged. In light of the damage from the hurricane, Mr. Swope was forced to lease a furnished apartment in Austin, Texas. During this time period, however, Mr. Swope was also traveling to the New York metropolitan area nearly every week on behalf of FAMCO, and was spending very little time at the leased apartment in Austin, Texas.

33. As a result, in November 2005, Mr. Swope rented an apartment in lower Manhattan, New York City, in order to reduce travel time and expense, and in order to focus his marketing efforts on behalf of FAMCO. Additionally, Mr. Swope was significantly involved in locating a potential buyer in New York for the sale of FAMCO; efforts which Mr. Swope continued on FAMCO's behalf in New York during the 1st and 2nd quarters of 2006.

34. FAMCO knew of and approved of Mr. Swope's relocation to New York City, and was aware that Mr. Swope was regularly performing and marketing FAMCO's services on its behalf in New York. In fact, Mr. Swope met with other FAMCO employees in New York on many occasions. In addition, FAMCO regularly sent Federal Express packages to Mr. Swope's New York City apartment, and frequently contacted him on his home telephone. In this regard, after being terminated by FAMCO, Mr. Swope contacted the company regarding COBRA benefits, and on September 15, 2006, FAMCO wrote to Mr. Swope and stated that "Upon your separation Fiduciary Asset Management had an address of: 10 Liberty Street, Unit 44E, New York, NY 10005. Your COBRA benefits continuation packet was mailed to this address."

35. As part of Mr. Swope's efforts in seeking a potential buyer of FAMCO, Mr. Swope participated in discussions with a number of interested parties in New York, including New York Life and Lehman Brothers' money management unit, Neuberger Berman. Mr. Swope personally attended and was actively involved in high-level meetings with both of these firms and spent a great deal of time talking about the market's response to individual FAMCO products. New York Life ultimately undertook a substantial effort to acquire FAMCO, however, Mr. Walbrandt turned New York Life away sometime in the second quarter of 2006. Thereafter, Mr. Swope continued to pursue business development and sale opportunities on behalf of FAMCO in New York.

36. On June 19, 2006, Mr. Swope left for a vacation after getting married, and for reasons unknown to Mr. Swope, his corporate credit card with FAMCO was cancelled that day. Two weeks later, Mr. Swope returned from his trip only to be asked to immediately leave FAMCO's premises. Mr. Swope was not even given time to collect his belongings from the office he kept at FAMCO's headquarters, including his personal files, a television set, desk chair and artwork valued at over one hundred thousand dollars.

37. Mr. Swope later submitted an expense report for his last expenses incurred on behalf of the company. FAMCO, however, refused to reimburse him approximately twenty thousand dollars worth of authorized business expenses.

38. Since terminating Mr. Swope and paying his second quarter 2006 commissions, FAMCO has likewise refused to pay Mr. Swope the quarterly commissions owed to him pursuant to the parties' agreement, an amount currently believed to be at least $1.3 million dollars, based on revenue obtained by FAMCO from assets raised by Mr. Swope and billed quarterly to FAMCO's clients since the second quarter of 2006.

39. Several months after his termination, FAMCO finally returned some of Mr. Swope's belongings, but only mailed a few of Mr. Swope's personal files to him at an address where he no longer lived. A number of important and relevant documents were also missing from those files, including FAMCO's March 2002 employment offer letter to Mr. Swope, the June 2005 equity distribution letter from Mr. Walbrandt awarding Mr. Swope and four others an 8% interest in FAMCO, and several years' worth of Mr. Swope's personal tax documents. FAMCO has since also acknowledged that despite Mr. Swope's demand, it continues to possess and therefore has converted the rest of Mr. Swope's property.

40. Several months after Mr. Swope was terminated, FAMCO announced that it had signed a definitive agreement to be acquired by Piper Jaffray. The transaction subsequently closed on September 14, 2007, for $51.3 million dollars, plus an amendment to the purchase agreement potentially worth an additional $15.1 million dollars based on asset growth by December 2007. In addition, Piper Jaffray has agreed to potentially pay additional cash compensation depending on the performance of FAMCO through 2010.

41. With respect to the sale of FAMCO, Piper Jaffray's 8K filing with the Securities Exchange Commission indicates that the sellers of FAMCO were Charles Walbrandt, as well as the four other individuals granted an 8% ownership interest in FAMCO in June 2005, at the same time as Mr. Swope: Joseph Gallagher, Wiley Angell, Mohammad Riad, and Jim Cunnane. Mr. Swope was not identified as a seller of FAMCO. To date, however, neither FAMCO nor Piper Jaffray has purchased back Mr. Swope's 8% interest in the company, nor has Mr. Swope been paid any distribution in relation to the sale. To the contrary, FAMCO claims that Mr. Swope has no ownership interest whatsoever in FAMCO.

42. Given the foregoing, it now appears clear that FAMCO, a company built by individuals who have had long standing and special relationships with each other, decided to reap for itself the benefits of Mr. Swope's expertise and contacts to secure for the company an institutional client base. After generating significant growth in revenue for FAMCO during each year that he was employed, and after bringing into FAMCO over 20 institutional investors, who in turn provided FAMCO with $20 million dollars or more in revenue, FAMCO and its management apparently decided to wrongfully "eliminate" significant overhead expense relating to Mr. Swope's salary and commissions, and in the process, improperly convert for themselves Mr. Swope's "share of the pie" resulting from a sale of FAMCO.

43. By terminating Mr. Swope as it did, FAMCO and its management thereby falsely created the appearance to potential FAMCO acquirers of having "saved" more than $1 million dollars in operating expenses by not paying Mr. Swope his salary and the commission owed to him. Worse still, FAMCO and its management have now added insult to injury by depriving Mr. Swope, and converting for themselves, Mr. Swope's share of the proceeds resulting from the sale of FAMCO to Piper Jaffray.

44. Given the foregoing acts and omissions as described above, Mr. Swope has sustained substantial damages in an amount to be determined at trial. Given the egregious nature of Defendant's conduct in terminating Mr. Swope, depriving him of his commission payments and equity ownership, and converting his property and his equitable share of the proceeds from the sale of FAMCO, Mr. Swope is entitled to punitive damages as well.

## IV. CAUSES OF ACTION

### Count One: Breach of Contract

45. The allegations set forth above in paragraphs 1 to 44 are re-alleged and incorporated herein for all purposes.

46. Mr. Swope entered into a valid and enforceable agreement with FAMCO pursuant to which FAMCO promised to pay Mr. Swope commission on revenue from assets Mr. Swope raised for FAMCO, based on FAMCO's quarterly billing of investment management fees to clients. FAMCO promised to pay Mr. Swope those quarterly trailing commissions on a sliding scale percentage basis over the course of six years, such that Mr. Swope would receive 15 percent of the quarterly fees from a client in the first year, 10 percent of the quarterly fees in the second year, 5 percent of the quarterly fees in the third year, and 2 percent of the quarterly fees in the fourth through sixth year.

14

47. FAMCO has refused and failed to pay Mr. Swope the quarterly trailing commissions owed to him pursuant to the parties' agreement since the second quarter of 2006, despite Mr. Swope's demand that these commissions be paid.

48. As a result of the foregoing, FAMCO has breached its contract with Mr. Swope, and accordingly, Mr. Swope seeks all legally recoverable damages from FAMCO's for its breach of contract, and all interest as allowed by law, all in an amount to be determined at trial, but believed to be in excess of $1.3 million dollars.

### Count Two: Breach of Contract

49. The allegations set forth above in paragraphs 1 to 48 are re-alleged and incorporated herein for all purposes.

50. In consideration of, and as an inducement to, Mr. Swope's continued employment with FAMCO, and as an inducement to his continued support of efforts to sell the company, including subsequently accepting a $25,000 pay reduction in order to improve the appearance of FAMCO's earnings, in or about June 2005, FAMCO granted to Mr. Swope in writing an 8% equity interest in FAMCO.  FAMCO's grant of equity to Mr. Swope constitutes a valid and enforceable contract.

51. FAMCO's refusal to acknowledge, and its apparent failure to properly record the existence of Mr. Swope's ownership interest in FAMCO on the books and records of FAMCO, and FAMCO's subsequent failure to pay Mr. Swope his equitable share of the proceeds from the sale of FAMCO to Piper Jaffray constitutes a breach of contract.

52. Accordingly, and as a result of the foregoing, Mr. Swope seeks all legally recoverable damages from FAMCO for its breach of contract, and all interest as allowed by law, all in an amount to be determined at trial, but believed to be in excess of $4.1 million dollars.

## Count Three: Unjust Enrichment

53. The allegations set forth above in paragraphs 1 to 51 are re-alleged and incorporated herein for all purposes.

54. In the alternative, and as a result of the foregoing, FAMCO has been unjustly enriched at Mr. Swope's expense.  As a result of its wrongful conduct, FAMCO unjustly obtained benefits from Mr. Swope that it otherwise would not have obtained.  To prevent unjust enrichment, Mr. Swope seeks all legally recoverable damages from FAMCO, and the disgorgement of FAMCO's ill-gotten gains, all in an amount to be determined at trial, but currently believed to be no less than $5.4 million dollars.

## Count Four: Quantum Meruit

55. The allegations set forth above in paragraphs 1 to 54 are re-alleged and incorporated herein for all purposes.

56. In the alternative, and as a result of the foregoing, Mr. Swope also seeks recovery on the basis of quantum meruit.  During his employment with FAMCO, Mr. Swope performed a number of valuable services for FAMCO with a reasonable expectation that he would be fully compensated for the reasonable value of the services he provided. FAMCO willingly accepted the benefit of these services, and yet failed to fully compensate Mr. Swope for their reasonable value.  As a result, Mr. Swope seeks to recover from FAMCO the reasonable value of the services he performed, all in an amount to be determined at trial, but currently believed to be no less than $5.4 million dollars.

## Count Five: Accounting and Constructive Trust

57. The allegations set forth above in paragraphs 1 to 56 are re-alleged and incorporated herein for all purposes.

58. As a result of the foregoing, a constructive trust in an amount representative of the 8% ownership interest granted to Mr. Swope by FAMCO should be established to preserve the funds received from the sale of FAMCO for distribution to Mr. Swope.

59. On or about April 13, 2007, FAMCO announced that it had entered into a definitive agreement to be acquired by Piper Jaffray. The transaction closed on September 14, 2007, for at least $51.3 million dollars, plus an amendment to the agreement for an additional $15.1 million based on asset growth by December 2007. FAMCO breached its fiduciary duty to Mr. Swope as an equity holder in FAMCO by apparently not making Mr. Swope a record owner of the ownership interest granted to him, resulting in the Piper Jaffray transaction closing without Mr. Swope's ownership interest being properly accounted for, and without Mr. Swope having the opportunity to exercise any shareholder rights that he may have. Accordingly, Mr. Swope seeks an order imposing a constructive trust in the amount of at least $4.1 million to protect the availability of sufficient funds from the sale of FAMCO to Piper Jaffray to preserve for distribution Mr. Swope's equitable interest in FAMCO.

60. In addition, and as a result of the foregoing, Mr. Swope seeks an order directing FAMCO to account to Mr. Swope for all revenue and income received from the date of Mr. Swope's termination until the present, and upon said accounting, to turn over all funds rightfully owing to Mr. Swope, including, but not limited to, all commission payments due and owing, as set forth herein.

### Count Six: Request to Inspect the Corporate Books and Records

61. The allegations set forth above in paragraphs 1 to 60 are re-alleged and incorporated herein for all purposes.

62. As a result of the foregoing, Mr. Swope seeks an order permitting an inspection by Mr. Swope of the books and records of FAMCO in order to ascertain the financial condition of FAMCO from the time of Mr. Swope's termination to the present, to learn the propriety of any dividend distribution, to calculate the value of stock, to investigate management's conduct, and to obtain information in aid of legitimate litigation in accordance with New York Business Corporation Law § 624.

### Count Seven: Account Stated

63. The allegations set forth above in paragraphs 1 to 62 are re-alleged and incorporated herein for all purposes.

64. In July of 2006, an account was stated between Mr. Swope and FAMCO for business expenses incurred by Mr. Swope during his employment in the amount of approximately twenty thousand dollars.

65. FAMCO received and retained such account without objection.

66. Accordingly, and as a result of the foregoing, an account was stated between Mr. Swope and FAMCO in the total principal amount of twenty thousand dollars, none of which has been paid, despite due demand.

### Count Eight: Conversion and Replevin

67. The allegations set forth above in paragraph 1 to paragraph 65 are re-alleged and incorporated herein for all purposes.

68. FAMCO has wrongfully converted property, records, funds and equity ownership in FAMCO belonging to Mr. Swope, and to this day, has exercised dominion and control over said property, records, funds and equity ownership in FAMCO, despite Mr. Swope's demand for their return. As a result of the foregoing, Mr. Swope seeks all damages recoverable by law and seeks

recovery from FAMCO of all items of real, personal, intangible and tangible property of every kind and description belonging to Mr. Swope, including but not limited to monies wrongfully withheld by FAMCO.

69. The willful wrongful tortious acts and omissions of FAMCO outlined herein are of an outrageous and treacherous nature for which the law permits punitive damages in order to punish FAMCO, and to deter it from further commission of said wrongful acts and omissions and serve as an example to others. Accordingly, Mr. Swope also seeks a judgment against for punitive damages in an amount to be determined at trial, but at least $15 million dollars.

**WHEREFORE**, Plaintiff Jeffrey O. Swope prays for the following relief:

1. On the First Cause of Action, a judgment in an amount to be determined at trial, but believed to be at least $1.3 million dollars, together with all recoverable interest thereon;

2. On the Second Cause of Action, a judgment in an amount to be determined at trial, but believed to be at least $4.3 million dollars, together with all recoverable interest thereon;

3. On the Third and Fourth Causes of Action, a judgment in an amount to be determined at trial, but believed to be in excess of $5.4 million dollars, together with all recoverable interest thereon;

4. On the Fifth and Sixth Cause of Action, an order imposing a constructive trust in favor of Mr. Swope for at least $4.3 million, as well as a formal accounting and an inspection of the corporate books and records of FAMCO and the surrender to Mr. Swope of all funds wrongfully withheld;

5.  On the Seventh Cause of Action, a judgment in an amount to be determined at trial, but believed to be at least twenty thousand dollars, together with all recoverable interest thereon;

6.  On the Eighth Cause of Action, a judgment in an amount to be determined at trial, but believed to be at least $5.5 million dollars, together with all recoverable interest thereon, and a return of all tangible and intangible property belonging to Mr. Swope.

7.  A judgment for punitive damages in an amount to be determined at trial, but at least $15 million dollars;

8.  An award of all costs and expenses, including reasonable attorney's fees, incurred in prosecuting this action; and

9.  An award of all pre-and post-judgment interest allowed by law;

10. Such other and further relief as to which Mr. Swope may be justly entitled.


Dated:        New York, New York
              October 1, 2007


                            Respectfully submitted,

                            CROSBY HIGGINS LLP


                            _____
                            Todd A. Higgins, Esq. (TH 7920)
                            500 Fifth Avenue, Suite 1410
                            New York, NY  10110

Ph: (646) 452-2300
Fx: (646) 452-2301

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2007, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Matthew B. Robinson and Stanley S. Schroeder
> Lowenbaum Partnership, L.L.C.
> 222 S. Central Avenue
> Suite 901
> St. Louis, MO 63105
>
> Matthew Katz and Jonathan Hochman
> Schindler Cohen & Hochman
> 100 Wall Street
> New York, NY 10005
>
> (counsel for Defendant)

> /s/ Todd A. Higgins
> Todd A. Higgins, Esq. (TH 7920)
> Crosby & Higgins, LLP
> 500 Fifth Avenue,
> Suite 1410
> New York, New York 10110
> *(phone)* (646) 452-2300
> *(fax)* (646) 542-2301
> thiggins@crosbyhiggins.com
> *Attorneys for Plaintiff*